IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| HUDSON GREENLAND A/S, a wholly owned subsidiary of Hudson Resources, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> CARVER MARITIME, LLC, <br><br> Defendant. | Civil Action No.: 2:20-cv-01750-DCN <br><br> **COMPLAINT** <br> **(Non-Jury)** |

COMES NOW Plaintiff Hudson Greenland A/S, a wholly-owned subsidiary of Hudson Resources, Inc., and files this Complaint against Defendant Carver Maritime, LLC for damages and, upon information and belief, alleges and states as follows:

**PARTIES**

1. Plaintiff Hudson Greenland A/S, a wholly-owned subsidiary of Hudson Resources Inc., ("**Hudson**"), is a private limited company organized under the laws of Greenland, with company registration number A/S600021, with its registered office at c/o Nuna Advokater, Quillilerfik 2, 6, Postboks 59, 3900 Nuuk, Greenland, and its principal place of business located in Greenland.

2. Defendant Carver Maritime, LLC ("**Carver**") is a marine terminal operator, stevedore, and warehouse operator organized under the laws of the State of New York, with its principal place of business located at 1400 Pierside Street, North Charleston, South Carolina.

3. As discussed more thoroughly below, on July 17, 2019, Plaintiff and Defendant entered into an agreement related to vessel stevedoring, marine terminal services, and warehousing

1

and transshipment of Plaintiff's cargo (hereinafter the "**Stevedore and Terminal Services Agreement**"). Defendant was to perform the Stevedore and Terminal Services Agreement in the State of South Carolina.

## JURISDICTION AND VENUE

4. Plaintiff is asserting contract and tort claims against the Defendant in this action. The amount in controversy exceeds $75,000.

5. By virtue of the complete diversity of citizenship of the parties, and the fact that the amount in controversy exceeds $75,000, this Honorable Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332(a).

6. This Court has personal jurisdiction over the Defendant because it purposefully directed its activities to the State of South Carolina, and the Plaintiff's claims arise out of that conduct.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Port of Charleston, in this District.

## FACTUAL ALLEGATIONS

8. Hudson is in the business of mining anorthosite (calcium feldspar) (the "**Material**" or "**Cargo**") in Greenland and shipping the Material in bulk aboard oceangoing cargo ships to worldwide markets for use as a raw material in numerous manufacturing industries.

9. At all relevant times, Carver was and is a marine terminal operator, stevedore and warehouse operator, and operates a dry-bulk ocean shipping terminal located at Pier J on the Cooper River in the Port of Charleston, as well as in several warehouses on nearby surrounding properties.

10. On or about November 2, 2018, Hudson's Senior Logistics Manager, Ted Winter, approached Carver's Senior Vice President for Port Business Development, Charles Tillotson, to inquire whether Carver would be interested in stevedoring, handling, storing, and transshipping Hudson's Material at Carver's marine terminal and surrounding warehouses in North Charleston, South Carolina. As set forth in further detail below, negotiations between Hudson's principals and Carver's principals would culminate in the parties' execution of the Stevedore and Terminal Services Agreement, a copy of which is attached hereto as **Exhibit 1**.

11. During this time, Hudson was in the process of developing a mine to extract its Material in Greenland. The mine was not yet operational in November 2018 when Winter initiated discussions with Mr. Tillotson, but it would be by the spring of 2019.

12. As later chronicled in numerous email correspondences between principals from Hudson and Carver between November 2018 and the eventual execution of the Stevedore and Terminal Services Agreement in July 2019, Hudson planned to load oceangoing bulk carrier ships at its mine in Greenland, which ships would sail to Carver's marine terminal at Pier J in North Charleston. There, Carver, as terminal operator and stevedore, would discharge the Cargo from Hudson's ships and store the Cargo in warehouses for subsequent transshipment.

13. The Stevedore and Terminal Services Agreement provided that Carver, as stevedore, would discharge the Cargo at Pier J, using ship's cranes into Carver's dockside hoppers, which would then load it into dump trucks, also hired or otherwise provided by Carver, to move the cargo into Carver's warehouses.[1]

---

[1] One warehouse was approximately 40,000 square feet and the other was 35,000 square feet, and Carver could make either or both warehouses available to Hudson on 120 days' notice.

3

14. The Stevedore and Terminal Services Agreement provided further that once Carver stowed the Cargo in its warehouse, Carver personnel would, whenever directed by Hudson, load the Cargo into super-sacks and then load the super-sacks into shipping containers.[2] The containers could then be exported to markets in Veracruz, Shanghai, Europe and elsewhere at Hudson's direction.

15. Under the terms of the Stevedore and Terminal Services Agreement, Carver would quote prices to Hudson to perform all of these services, by metric ton and in the following increments: stevedore to hook, hook to place of rest (in Carver's warehouse), bagging into super-sacks, and stuffing containers for export.

16. On November 2, 2018, Carver's Charles Tillotson emailed Hudson's Ted Winter and advised, "Cole [Patterson] and I discussed the opportunity and believe that we can accommodate Hudson's needs. We look forward to getting this deal done."

17. On November 28, 2018, Mr. Tillotson emailed Ted Winter with proposed rates, itemized for all of the aforementioned handling of Hudson's Material for a 20-year term (10-year base term and 10-year extension).

18. On December 6, 2018, Mr. Tillotson sent by email to Ted Winter a draft Letter of Intent ("LOI") addressed to Hudson's then president, James Tuer, proposing a 10-year turnkey operation for Carver to unload, store, and trans-load Hudson's Cargo at Carver's marine terminal in North Charleston.

19. On December 13, 2018, Hudson's James Tuer and Ted Winter traveled to South Carolina to meet with Carver's leadership team in North Charleston. Together, the principals inspected Carver's terminal and discussed the contemplated operation. Mr. Tuer stressed how

---

[2] Carver was alternatively prepared to make arrangements to load the cargo into railcars in bulk.

dusty the Material would be and the importance of preventing contamination. Hudson's team also described the Material as 250 microns (metric measurement) or 60 mesh (U.S. measurement equivalent), meaning that ninety-eight (98) percent of the Material cannot have a particle size larger than 250 microns or 60 mesh.

20. On January 7, 2019, Carver remained interested in the potential contract with Hudson and sent a revised Letter of Intent to Hudson. The LOI stated that Carver "[w]ill design per HUDSON's Engineering 60 mesh specification as mutually agreed to attain needed production and quality." Thus, the 60 mesh/250-micron sieve size of the Material was expressly known to Carver, as Carver inserted the specification into the draft of its Letter of Intent to Hudson.

21. The parties executed the LOI on January 24, 2019. Hudson issued a press release on February 4, 2019 to announce that it had entered the Letter of Intent with Carver for Carver to set up a dedicated facility to handle, store, and trans-load Hudson's material on a long-term basis at the Port of Charleston.

22. On May 8, 2019, Hudson's new president, Jim Cambon, its vice president of operations, Jerry Janik, and its senior logistics manager, Ted Winter all met at Carver's facility in North Charleston with Carver's operations manager, George McHugh, and sales and business development representative, Cole Patterson. During this meeting, Hudson's Jim Cambon again stressed that the Material was very dusty.

23. On May 10, 2019, Carver's Charles Tillotson sent an email to Hudson's Ted Winter and Jim Cambon, copying Carver colleagues George McHugh, Cole Patterson, and Stephen Kelly and acknowledging the dust issue. Mr. Tillotson advised, "[o]ur only remaining concern is the dust discussion. We were under the impression that the product would not be as dusty as our

5

*current understanding. We will need to review a dust mitigation plan to ensure that we comply with dust standards and keep our neighbors from complaining.*"

24. In the same May 10, 2019 message, Mr. Tillotson suggested his team take "*a trip to Greenland and France to get in front of creating solutions for all the handling issues* [for Hudson's Material] *in the U.S. and France.*" Thus expressly on notice of the dusty nature of Hudson's Material and the need to develop a dust mitigation plan, Carver principals never did visit Hudson's mine in Greenland, but they would nevertheless enter into the Terminal Services Agreement, with its 10-year term, and without any conditions precedent whatsoever regarding "the dust discussion."

25. On June 20, 2019, Carver's Cole Patterson sent an email to Ted Winter, copying Carver colleagues Tillotson and McHugh, to confirm that Carver would have warehouse space available to store Hudson's first shipment of Material, set to arrive on a bulk carrier laden with some 15,000 metric tons of Cargo (+/- 5 percent) sometime around the period of July 28th to August 5, 2019.

26. On July 11, 2019, Hudson's Ted Winter and Jim Cambon held a conference call with Mr. Tillotson and his colleagues at Carver, and Mr. Cambon specifically discussed how dusty the Material was. Mr. Cambon followed up the call with an email to Carver's Cole Patterson in which he "*recommend[ed] you look at extra filtration systems for the cab and engines of the vehicles that would be in the warehouse with the material.*" Mr. Cambon then provided full information for a vendor in Montreal who specialized in filtration systems and equipment for handling this type of Material.

WBD (US) 48902869v2

27. Carver's Cole Patterson replied the next day to thank Mr. Cambon for that "*great information*." Despite acknowledging Hudson's filtration systems recommendation, Carver never installed dust mitigation equipment.

28. On July 17, 2019, Carver's Senior Vice President of Business Development Stephen Kelly and Hudson's President Jim Cambon, on behalf of their respective companies, executed the Stevedore and Terminal Services Agreement. To the extent Carver executives ever wished to inspect Hudson's Material before entering into the Stevedore and Terminal Services Agreement, Carver executives declined Hudson's invitation to do so. Rather, Carver elected to proceed without inspecting the Material and executed the contract without any reservations or conditions precedent.[3]

### A.    THE TERMS OF THE STEVEDORE AND TERMINAL SERVICES AGREEMENT

29. The "Initial Term" of the Stevedore and Terminal Services Agreement commenced on August 1, 2019 and would run for 12 months.[4] During the Initial Term, the Agreement provides that the parties "shall negotiate an agreement for a base term of ten (10) years plus two five (5) year options for the design, construction, and operation of a new facility to handle Hudson's Material as already performed in the Initial Term plus additional services for processing and micronizing of the Material."[5]

30. The Agreement defines "Material" as bulk calcium feldspar, which is anorthosite.[6]

---

[3] In any event, various terminals in the southeastern United States routinely handle cargoes far dustier than Hudson's calcium feldspar (anorthosite) material, such as kaolin clay and cement. It was also Hudson's understanding that Carver handled and stored bulk cement in the warehouse that Hudson was allocated prior to the arrival of the *Happy Dragon*.

[4] Agreement at § 2.1.
[5] Agreement at § 2.2.
[6] Agreement at Recitals, Paragraph B.

31. Section 3 of the Agreement defines the "Services" Carver agreed to perform for Hudson during the Initial Term. In this section, Carver bound itself to perform, among other things, the following Services:

- Unloading the Material from ships and transferring the Material to designated places of rest (warehouses) within Carver's Facilities.[7]
- Storing the Material in a dry warehouse building without contamination.[8]
- Preparing the Material for onward movement by:
    - Bagging the Material in super sacks and labeling for export,[9]
    - Accepting clean intermodal shipping containers and stuffing the Material into containers for export, together with preparing interchange agreements based on export documentation received from Hudson,[10]
    - Coordinating container drayage to designated terminals specified on the booking information, and
    - Performing the same services with respect to bulk container stuffing, and bulk railcar loading.[11]

32. Section 3 of the Agreement also incorporates "Exhibit A – Rate Schedule" into the Agreement. This Exhibit A includes the following language:

> <u>Rates include</u>:
>
> - Transporting Material from vessel hold to place of rest at storage facility at building 1079. All machinery and equipment with dust suppression.

33. For its part, Hudson agreed to provide Carver a minimum annual guarantee of 15,000 metric tons of Material to handle during the Initial Term, as Carver bargained for.[12]

---

[7] Agreement at § 3.1.1.
[8] Agreement at § 3.1.4.
[9] Agreement at § 3.1.5.1.
[10] Agreement at § 3.1.5.1.
[11] Agreement at § 3.1.5.2 – 3.1.5.3.
[12] Agreement at § 3.3.

34. Of particular relevance to Carver's performance of the Services under the Agreement is Section 7, which provides as follows:

> 7. Standard of Operations
>
> Carver will conduct its operations under this Agreement legally and professionally and will comply with all state and federal laws, rules, and regulations applicable to said operations, including without limitation all Federal, e.g. Occupational Safety & Health Administration (OSHA) and State safety laws. ***Carver will provide safe facilities for the performance of all Services, including without limitation a dust suppression system to minimize dust exposure to personnel***.

(Emphasis added). Thus in this Agreement, Carver undertook the duty to comply with applicable laws and regulations, and to provide a dust suppression system.

35. Section 8 of the Agreement addresses indemnity:

> 8. Indemnity
>
> 8.1 Each Party (in this Section 8, the "Indemnifying Party") will, defend, indemnify, and hold the other Party…harmless from all expenses, … damages, and liabilities (including attorney fees and consultant's fees and expenses at trial, and appeal or review) which arise in connection with the performance of this Agreement by the Indemnifying Party, except to the extent caused by the negligence of the Indemnified Party."

33. Where, as here, Carver breached the Agreement by failing to perform the Services promised under the Agreement, Carver is the "Indemnifying Party" and must indemnify and hold Hudson harmless for the damages, costs, and attorneys' fees Hudson has incurred, and continues to incur, as a direct result of Carver's breach and failure to perform.

WBD (US) 48902869v2

### B. THE BREACH OF THE STEVEDORE AND TERMINAL SERVICES AGREEMENT

34. As a professional stevedore, terminal operator, and warehouseman, Carver is expected to "possess reasonable skill and expertise" in handling cargoes. THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 530 (3d ed. 2001) (citing cases). As such, Carver is liable, among other reasons, "based on its contract with the carrier" or shipper, and based on the "breach of its obligation to perform its duties in a workmanlike fashion." *Id.*

35. As recounted in the timeline above setting forth the contents of emails and meetings in person with Hudson principals, Carver personnel were on actual notice of the dustiness of the Material before Carver voluntarily entered into the Stevedore and Terminal Services Agreement with Hudson on July 17, 2019.

36. Carver was free to travel to Greenland to see the Material firsthand before entering into the Agreement but did not do so.

37. Carver was also free to investigate and examine the handling of other dusty dry-bulk cargoes such as bulk cement (approximately 200 mesh), frac sand (100 to 140 mesh) or kaolin clay (325 mesh), which are both far dustier and commonly handled in nearby facilities, before entering into the Agreement, but upon information and belief, Carver did not do so.

38. Any stevedore possessed of "reasonable skill and expertise" is expected to understand the properties of a dry bulk cargo before entering into a contract to handle it. The 250-micron/60 mesh size is not arcane.[13] Furthermore, as explained below, at least one stevedore in

---

[13] Mesh count reflects the size of cargo particles that can pass through a screen, measured by the number of openings per linear inch of screen. A 4 mesh screen means there are four square openings across one inch of screen. A 100 mesh screen has 100 openings per linear inch, and so on. Thus, the higher the mesh number, the finer the material. Mesh is a U.S. measurement, and 60 mesh is equal to the metric measurement of 250 microns.
*See, e.g.,* https://www.industrialspec.com/resources/mesh-and-micron-sizes/

the local region was able to handle Hudson's Material without issue and without unusual measures or exotic equipment. Thus, Carver's failure to perform the Services promised in the Stevedore and Terminal Services Agreement is a breach of contract without excuse.

39. The events leading up to the breach transpired as follows: On August 13, 2019, Hudson's Ted Winter sent pictures to Carver's Cole Patterson and George McHugh of the vessel loading Hudson's Material in Greenland to show the dustiness of the cargo. On August 15, 2019, Winter sent a follow-up email to Messrs. Tillotson, Patterson, and McHugh in which he asked "Did you receive my emails about the loading of the [vessel] *H[appy] Dragon*?"

40. On August 17, 2019, Hudson's Ted Winter wrote to Carver's Cole Patterson and George McHugh to advise he planned to travel to Charleston the following week "to give you a recap of the loading." He added, "[t]he material is definitely dusty."

41. On August 22, 2019, Hudson's Ted Winter arrived at Carver's terminal and met with Cole Patterson, Terminal Superintendent Jerry Ward, and Operations Superintendent Chris Trotter. Mr. Winter showed them pictures and videos of the loading of the vessel *Happy Dragon* in Greenland and emphasized the dustiness of the Material as shown in the videos.

42. The Carver principals did not raise any objections to Mr. Winter about the dust, and yet, upon information and belief, they also made no preparations to handle it.[14]

43. On August 30, 2019, further confirming the existence of the Stevedore and Terminal Services Agreement, Carver's Charles Tillotson sent an email to Ted Winter and Jim Cambon to add certain incidental stevedoring and storage charges supplemental to the original

---

[14] Preparations would include filtration equipment for vehicle cabs and engines, and seals for dump truck tailgates to prevent spillage, the latter of which are inexpensive and a common solution in the industry.

11

Agreement. Carver's Mr. Tillotson raised no objection to the anticipated dust or expressed any doubts about Carver's ability to perform the Services required under the Agreement.

44. August 30, 2019 was the Friday before Labor Day weekend. Hudson's chartered bulk carrier, the M/V *Happy Dragon* arrived at Carver's terminal in North Charleston that morning. Carver first discharged certain bagged Cargo, while the balance of Hudson's Material was loose bulk Cargo in the vessel's cargo holds.

45. Carver then commenced discharging the loose bulk Material into hoppers and then into dump trucks to be transported to Carver's warehouse in Building 1079, as required by the Stevedore and Terminal Services Agreement. Carver started discharging bulk Material, from Hold No. 2 at 4:10 p.m. At approximately 5:30 p.m., after discharging only 42 metric tons out of some 15,000 metric tons of Cargo aboard the vessel, Carver's George McHugh stopped the operation and refused to discharge Hudson's chartered vessel.

46. McHugh cited Cargo leaking from the dump trucks during transit to the warehouse as Carver's reason for refusing to discharge the Cargo. Hudson's Ted Winter was present on Carver's terminal when Mr. McHugh announced this decision and urged Mr. McHugh to consider alternative steps to transport the Cargo, such as sealing the tailgates of the dump trucks.

47. Mr. McHugh refused to consider or implement any remedial measures, and on behalf of Carver categorically refused to perform the Services defined in the Stevedore and Terminal Services Agreement.

48. On August 31, 2019, Carver's Mr. Tillotson sent a letter by email to Ted Winter in which he stated that the Material "is deemed too fine to be unloaded from the vessel to the dock in Charleston, South Carolina, Pier J due to no fault of Carver Maritime Charleston."

49.     Hudson thus had a ship full of Cargo and no stevedore or terminal to discharge and handle it, despite its having a negotiated, written, and duly executed Stevedore and Terminal Services Agreement with Carver to perform precisely those Services.

50.     The holiday weekend notwithstanding, Hudson scrambled to find a stevedore competent to unload the *Happy Dragon* and transport and warehouse Hudson's Material. Hudson contacted stevedores up and down the East Coast and Gulf Coast of the United States to find an available stevedore and terminal to discharge the vessel and store the Cargo.

51.     Here, it should be noted that on the evening of August 30th, Carver's Charles Tillotson had contacted Hudson's Ted Winter by telephone to suggest that Carver might be able to charter a barge so as to unload the M/V Happy Dragon, several days after the then-approaching Hurricane Dorian had passed. Hudson's Ted Winter replied by email to advise Tillotson that the "barge idea is the best option." However, in a subsequent phone call to Mr. Winter, Mr. Tillotson advised that Carver's George McHugh had rejected the proposed barge solution. As Carver would entertain no further solutions, Hudson had no choice but to divert the M/V Happy Dragon to another port and terminal, in search of a willing and competent stevedore.

52.     After an extensive search, Hudson's Mr. Winter eventually identified Colonial Terminals in Savanah, Georgia ("**Colonial**") as willing and able to do the job, albeit at a higher cost. In the end, Hudson was forced to pay those higher costs, to rent grabs[15] from Carver to discharge the vessel, and to sail the ship to Colonial in Savannah.

53.     Colonial discharged the vessel's remaining 13,882 metric tons of Cargo into hoppers, then into dump trucks, and then into a warehouse. Colonial accomplished the entire

---

[15] "Grabs" are the shipping term for clamshell-type shovels used by ships' cranes to load and discharge dry-bulk cargoes in cargo holds.

13

operation without incident in four and a half days. The difference between Colonial's successful operation and Carver's fleeting attempt was as follows: (a) Colonial provided suitable dust suppression systems to minimize dust, and (b) Colonial rented dump trucks that were properly sealed. In other words, Colonial exercised "reasonable skill and expertise … to perform its duties in a workmanlike fashion" and Carver did not.[16]

### C.  DAMAGES

54. As a result of Carver's breach of the Stevedore and Terminal Services Agreement, Hudson has incurred actual and direct damages.

55. Hudson's damages break down into three categories. The first category arises from Hudson having had to discharge the M/V *Happy Dragon* at Colonial in Savannah, rather than as agreed and contracted with Carver to discharge at Carver's terminal in the Port of Charleston.

56. The second category relates to damages Hudson sustained during the balance of the Initial Term of the contract, that is, through August 1, 2020, during which time Hudson anticipated sending two more shipments of 15,000 metric tons each to Carver.

57. The third category reflects the damages which Hudson will sustain over the ten-year term of the Stevedore and Terminal Services Agreement, following the Initial Term.

#### i.  The *Happy Dragon* Damages

58. As a result of Hudson's diligence and efforts to mitigate its damages, Hudson was able to arrange for Colonial to discharge the M/V *Happy Dragon*. However, as itemized in **Exhibit 2**, Hudson incurred additional costs in the amount of **$858,322.80** to discharge the vessel at Colonial instead of at Carver's terminal, as contracted.

---

[16] THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 530 (3d ed. 2001).

### ii.     The Initial Term Damages

59.     During the course of the Initial Term of the Agreement, which runs through July 31, 2020, Hudson had planned to send two more ships to Carver, each laden with 15,000 metric tons, for a total of 45,000 metric tons in the first year.[17]  However, as shown in **Exhibit 3**, Hudson will now incur **$751,560** in additional damages during the Initial Term for the cost differential of sending the two additional vessels to Colonial, rather than to Carver's terminal, as contracted.

### iii.     The Long Term Damages

60.     The cost differential of using Colonial in Savannah in lieu of Carver's terminal over the following ten years as contracted in the Agreement amounts to **$45,866,600** in additional costs, based on ramping up production to 100,000 metric tons in the first year after the Initial Term, and 170,000 metric tons per year thereafter.  The Long Term Damages are itemized in **Exhibit 4**.

### iv.     The Lost Equipment Damages

61.     Carver unloaded from the M/V *Happy Dragon* at the Carver terminal, among other things, three man-lifts that belong to Hudson.  Despite repeated efforts since August 2019 to send trucks onto Carver's terminal to retrieve the man-lifts, Carver personnel have refused to release the man-lifts to Hudson and have turned Hudson's trucks away.  While one man-lift is best used for spare parts and has a scrap value only, the other two have a combined value of **$77,922**.  *See* **Exhibit 5**.

---

[17] This includes 15,000 MT shipped in the *Happy Dragon* for a total of 45,000 MT in year one.

## CAUSES OF ACTION:

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT

62. Hudson realleges and incorporates by reference all preceding allegations, as if they were fully repeated verbatim herein.

63. At all times relevant hereto, the Stevedore and Terminal Services Agreement constitutes a valid and binding maritime contract between Hudson and Carver.

64. By failing and refusing to perform its obligations under the Stevedore and Terminal Services Agreement, Carver has materially breached the contract.

65. As a direct and proximate result of the Carver's breach of the Stevedore and Terminal Services Agreement, Hudson has suffered monetary losses and damages as recited herein.

### FOR A SECOND CAUSE OF ACTION: NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS, WILLFULNESS AND WANTONNESS

66. Hudson realleges and incorporates by reference all preceding allegations, as if they were fully repeated verbatim herein.

67. At all times relevant hereto, Carver is subject to certain duties of care imposed by contract and by law.

68. Carver has breached one of more of these duties of care by virtue of:

   a. Failing to sufficiently educate itself as to the nature and properties of the Material;

   b. Failing to sufficiently educate itself as to the measures that would be necessary to handle the Material;

   c. Failing to employ agents, representatives, employees, and / or contractors with the requisite education, training, and experience necessary to determine whether and

WBD (US) 48902869v2

how Carver could accommodate Hudson's request for services and handle the Material involved, or otherwise provide such education, training, and experience;

d. Failing to raise any objections or concerns regarding the nature and properties of the Material prior to entering into the Stevedore and Terminal Services Agreement and commencing work;

e. Misrepresenting to Hudson that it was capable of handling the Material and performing its obligations under the Stevedore and Terminal Services Agreement;

f. Misrepresenting to Hudson the nature and extent of its stevedoring and marine terminal operations expertise;

g. Inducing Hudson to consummate the Stevedore and Terminal Services Agreement despite Carver's breaches of duty cited herein;

h. Causing Hudson to justifiably rely on Carver's misrepresentations;

i. Failing to sufficiently prepare itself and take appropriate measures to handle the Material and fulfill its obligations under the Stevedore and Terminal Services Agreement, including but not limited to sealing the tailgates and beds of its dump trucks;

j. Failing to employ agents, representatives, employees, and / or contractors with the requisite education, training, and experience necessary to fulfill its obligations under the Stevedore and Terminal Services Agreement, or otherwise provide such education, training, and experience;

k. Failing to offer sufficient alternative options or solutions in order to fulfill its obligations under the Stevedore and Terminal Services Agreement;

17

    l.    Refusing to perform its obligations under the Stevedore and Terminal Services Agreement; and,

    m.    In such other particulars that may be established at the trial of this action.

69. As a direct and proximate result of Carver's negligence, gross negligence, recklessness, willfulness, and wantonness, Hudson has suffered pecuniary damages as recited herein.

### FOR A THIRD CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION

70. Hudson realleges and incorporates by reference all preceding allegations, as if they were fully repeated verbatim herein.

71. Carver misrepresented to Hudson that Carver was capable of discharging the Material, transporting it to a Carver warehouse, storing the Material, preparing it for transshipment, and otherwise fulfilling Carver's obligations under the Stevedore and Terminal Services Agreement.

72. Carver misrepresented to Hudson the nature and extent of its expertise.

73. Carver's misrepresentations constitute false representations by Carver to Hudson.

74. Carver had a pecuniary interest in making these statements to Hudson, such that it would induce Hudson to enter into a business relationship, and may then have created other business opportunities for Carver.

75. Carver owed a duty of care to Hudson to communicate only truthful information to Hudson.

76. Carver breached its duty by failing to exercise due care, as set forth herein.

77. Hudson justifiably and in good faith relied on Carver's misrepresentations.

WBD (US) 48902869v2

78.  As a direct and proximate result of its reliance on Carver's misrepresentations, Hudson suffered pecuniary losses and damages as recited herein.

WHEREFORE, Hudson requests that this Court exercise jurisdiction over the subject matter hereof and the parties hereto and issue judgment in favor of Hudson and against Carver for the injuries and damages sustained by Hudson described herein in an amount of actual and punitive damages to be determined by the trier of fact, for the costs of this action, for its reasonable attorneys' fees, for interest, and for such other and further relief as this Court may deem just and proper.

Respectfully submitted, this 5th day of May 2020 at Charleston, South Carolina.

|  | WOMBLE BOND DICKINSON (US) LLP |
|---|---|
|  | */s/ Sean Houseal* <br> Sean D. Houseal, Fed ID No. 7676 <br> Ryan D. Gilsenan, Fed ID No. 9837 <br> Ryan E. Ellard, Fed ID No. 12819 <br> 5 Exchange Street <br> P.O. Box 999 <br> Charleston, South Carolina 29401 <br> (843) 720-4622; (843) 720-4617 <br> Email:  Sean.Houseal@wbd-us.com <br>           Ryan.Gilsenan@wbd-us.com <br>           Ryan.Ellard@wbd-us.com <br> *Counsel for the Plaintiff* |